.0IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 21, 2012 Session

## IN RE: DAKOTA C. R. (d/o/b 6/11/2004)
## JIMMY D. R. JR. (d/o/b 3/5/2006)
## NATHANIEL E. R. (d/o/b 2/23/2007)

**Direct Appeal from the Circuit Court for McNairy County**
**No. 6266    J. Weber McCraw, Judge**

_____

**No. W2010-01946-COA-R3-JV - Filed April 24, 2012**

_____

This appeal arises out of dependency and neglect proceedings regarding three minor children. The circuit court found all three children dependent and neglected, and it found the youngest child had been severely abused. We affirm the dependency and neglect finding and the severe abuse finding with regard to Mother. However, we reverse the severe abuse finding with regard to Father.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Thomas E. Weakley, Dyersburg, Tennessee, for the appellant, Rosanna R. and Jimmy Dale R.

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, Shanta J. Murray, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Rosanna R. ("Mother") and Jimmy Dale R. ("Father") have a history with the Tennessee Department of Children's Services ("DCS"). While in the custody of Mother and Father, Father's two older boys, Cody and Seth, were removed based upon allegations of abuse and neglect.

This appeal involves allegations of abuse and neglect toward three children of Mother and Father: Dakota, Jimmy Jr., and Nathaniel.[1] DCS' current involvement stems from an October 30, 2007 incident. Mother claims that at approximately 11:00 P.M., while Father was at work, she took a shower, with the radio on "half-way[,]" while the children were sleeping–Nathaniel in a crib, Jimmy, Jr. on a sofa, and Dakota and Cody[2] in a "back bedroom." After fifteen to twenty minutes, she exited the shower and heard eight-month-old Nathaniel "crying[] and screaming[.]" She claims that she saw eighteen-month-old Jimmy, Jr. in Nathaniel's crib "hitting [Nathaniel] in the head with the cordless phone." She retrieved Nathaniel and held him "trying to calm him down[,]" but he continued to scream. She also attempted to put both ice and a warm "washrag" on Nathaniel's head, but, according to Mother, "[h]e wouldn't be still. He kept moving." Mother telephoned Father at work, and after Father returned home, Mother took Nathaniel to the McNairy Regional Hospital some time after midnight, while Father stayed home with the other children.

> A CT head scan was performed on Nathaniel, with the following findings: There is soft tissue swelling overlying the right frontal bone, and there is a nondisplaced fracture of the right frontal bone. No evidence of significant depression. There is no acute intracranial hemorrhage, mass effect, or midline shift. The basilar cisterns are patent. The gray-white matter differentiation appears preserved.

Both DCS and the McNairy County Sheriff's Department were soon alerted to the potential child abuse, and an investigation was launched. Nathaniel was released from the hospital on November 2, 2007, and all three children were placed in a foster home. Ultimately, a Petition to Adjudicate Dependency and Neglect was filed against Mother and Father in the McNairy County Juvenile Court, regarding Dakota, Jimmy, Jr., and Nathaniel, on November 6, 2007,

---

[1]A fourth child, who is not a subject of these proceedings, was born to Mother and Father in 2011.

[2]Mother denies knowing that Cody, according to an apparent court order, was not to be in her home without supervision.

and a guardian ad litem was appointed to represent their interests. On December 9, 2008, the juvenile court adjudicated the three children dependent and neglected, and it found that both Mother and Father had severely abused Nathaniel. Mother and Father appealed these findings to the McNairy County Circuit Court, and a trial was held on June 7 and June 21, 2010.

At trial, McNairy County Sheriff's Department Officer Allen Strickland, who took over the case the morning after the incident, testified regarding his observation and photographing[3] of "severe bruising and some scratches on the face, the forehead, and nose" of Nathaniel. Officer Strickland recovered the telephone allegedly used in the assault, and he observed no sharp edges on the phone or anything that could have caused scratches to Nathaniel. In fact, he "took the phone and rubbed it across [his] arm and showed all the edges and [he] could not produce any scratches whatsoever on [his] skin." He also visited Father's and Mother's home shortly after the incident, and saw nothing in Nathaniel's crib that could have caused Nathaniel's injuries. According to Officer Strickland, the parents' home is a "little single wide trailer" and the bathroom is "probably [] thirty feet" from Nathaniel's crib. Based upon this distance, he opined that someone in the shower–even with the water running–would hear a child screaming.

DCS Investigator Maria Mullins also visited the hospital where she observed Nathaniel's injuries, which she described at trial as "The whole front part of his head was black and blue and purplish, and [he] had scratches all over his head and a little blood under his nose[.]" She interviewed Mother and Father at the hospital and she explained to them that Nathaniel would not be allowed to leave the hospital with them. According to Ms. Mullins, Mother and Father were "very upset" and "[t]hey stated that their kids were rough. They just played hard and besides that, they said, 'Baby [Nathaniel] is okay.'" A child and family team meeting was conducted on November 1, 2007. Father participated in the meeting, but Mother "stormed out of there screaming and cursing and stating that DCS was not taking her children[.]"

On November 16, 2007, Ms. Mullins visited the children's foster home. She interacted with then-twenty-month-old Jimmy, Jr., the alleged perpetrator of Nathaniel's injuries, as follows:
> I held out my arms to him and then he grabbed a hold of my hands, and I just held him to see if he was going to stand up, and after difficulty he did stand up[.] . . . [I]t took him several attempts to stand up before he did [.]

_____

[3]These photographs depicting extensive scratching and bruising to Nathaniel's face are included in the record before us.

At the foster home, Dakota "pulled her shorts up and showed [Ms. Mullins] a scar on her leg where she had gotten a whipping [from her daddy with a belt]. It was about two and a half inches long and also, on her back, she had some marks across her back where she said her mommy had switched her." When Ms. Mullins asked Mother and Father about these marks, "They just stated their children play rough." Ms. Mullins photographed these injuries.

At a second child and family team meeting, Ms. Mullins was concerned because "neither [Mother] nor [Father] said one good thing about Jimmy, Jr., the eighteen month old, and they actually called him a demon child." According to Ms. Mullins, Mother and Father were uncooperative regarding DCS' recommendations, and they refused to sign "medical papers" or to bring the children's medications, causing Cody to go without his medication for several days. Ms. Mullins stated that Mother and Father began "parenting, anger management, counseling . . . case management" but they did not follow through to completion. Ms. Mullins stated that she did not "work the [DCS] case" regarding Cody and Seth, and therefore, she claimed to have no personal animosity nor any preconceived notions or bias against Mother or Father based upon their prior history with DCS, and she denied a DCS "witch hunt" against them. Based upon "the fact that neither parent was accepting any responsibility, but blaming little Jimmy and were very uncooperative, refusing to sign any medical release, refusing to bring Cody's medication[,]" Ms. Mullins believed placing the children in foster care was in their best interest.

Forensic interviewer Kim Gibson testified concerning her interview with three-year-old Dakota in January 2008. She testified that Dakota "made a statement that her mom had hit her and her brother and had beat her brother." Dakota also allegedly "disclosed that her father had also hit her with a belt and caused a scar on her leg[,]" and "she identified the peepee as being spanked by her mom and the dad." Ms. Gibson expressed concern when Dakota made statements that "she didn't love or like her mother and that she didn't want to live with her[,]" as, according to Ms. Gibson, such feelings are a-typical in young children.

The evidentiary deposition of Karen L. Lakin, M.D. was submitted at trial. Following a recitation of Dr. Lakin's extensive qualifications, she was tendered as an expert without objection. Dr. Lakin interviewed Dakota, Jimmy, Jr., and Nathaniel on December 10, 2007, for twenty minutes each, and she spent "an extensive amount of time" reviewing the medical/other records in this case.

Dr. Lakin explained that Nathaniel's CT scan indicated no intracranial injury–i.e. no intracranial bleeding. When questioned regarding her conclusion with respect to the history given as compared to the injury presented, Dr. Lakin testified as follows:

I was concerned that this was nonaccidental trauma because in my opinion the

one-year-old would not have been able to sustain enough force to fracture the skull of the eight-month-old.

[T]he skull . . . even in an eight-month-old . . . it takes some amount of force to fracture your skull. There was also a significant amount of soft tissue swelling and bruising and linear marks or abrasions on the surface of the forehead that looked like repeated blows to that area.

That would take a significant - - in my opinion it would take some coordination. And when you're talking about an eight-month-old and an eighteen month old, I think it would be a stretch to say that an 18-month-old would even have the ability to sustain that type of force to cause a skull fracture and then to be able to repeatedly beat the head of an 8-month-old and to hit the target - - I mean, to be very specific. So . . . it was a suspicious story.

. . . .

So it appeared from the physical finding that there may have been repeated blows and sustained blows. And if the story was that the one-year-old did that . . . there was no intervention. And I'm sure that the 8-month-old would have been crying or screaming during this whole episode.

So that was a concern. And then I was also concerned about how the one-year-old could get to the 8-month-old in order to injure him to begin with. If the 8-month-old was in the crib and the one-year-old was outside of the crib.

. . . .

In my examination of the one-year-old at LeBonheur in December, he also did not perform well on his developmental screen and failed the communication and gro[ss] motor and fine motor and problem solving.

And so this patient was also known to have or there had been some concern about developmental delay as well. So even developmentally and I'm not aware of exactly when he started walking or climbing. But that was a concern that he would have been able to coordinate carrying a telephone I mean, up into a crib reaching his target and then actually making his target all in the period of time without anyone knowing what happened or stopping it.

She, again, opined that the history given–Jimmy, Jr. striking Nathaniel with a telephone–was not consistent with the degree of Nathaniel's injuries. She stated that Jimmy, Jr. "being one year of age to be able to sustain that amount of force and aim and under those circumstances I think would be unlikely." The story, in her opinion, was "suspicious for nonaccidental trauma." In sum, Dr. Lakin characterized both Nathaniel's skull fracture and his soft tissue injury as "significant injur[ies]" with which "significant pain would be associated[,]" and she acknowledged that the force necessary to cause a skull fracture has the potential to cause great bodily harm.

In her deposition, Dr. Lakin also testified regarding her physical examination of Jimmy, Jr., which revealed "multiple linear hypopigmented marks that were approximately three to four centimeters in length along his right upper shoulder and across the back. . . [a]nd a looped mark that was on his left flank." Dr. Lakin explained that "[t]hese are the type of scars that we might see from an extension cord or some type of strap." Dr. Lakin also obtained a skeletal survey of Jimmy, Jr. which revealed healing fractures of different ages in both of his arms and in his left leg, which were "concerning for nonaccidental trauma based upon the lack of history and the lack of treatment." Dr. Lakin testified that Jimmy, Jr.'s arms were fractured "probably on the later end of [] seven to fourteen days [prior to her examination in December 2007]" or that they could have been injured "on the later end of the fourteen days and maybe even past the fourteen days [prior to her examination]" and that his leg was likely fractured seven to fourteen days prior to her examination. However, Dr. Lakin was unable to precisely identify when the injuries occurred and she acknowledged that the injuries could have been inflicted prior to October 31, 2007–that is, prior to Jimmy, Jr.'s removal from Mother's and Father's home. Dr. Lakin testified that Jimmy, Jr.'s already limited capabilities, as an eighteen-month-old, would have been further limited by the pain associated with his own injuries.

Regarding her physical examination of Dakota, Dr. Lakin testified that Dakota had a rash on her buttocks and that she was "concerned because [Dakota] had extreme anxiety related to loud noises." Dakota was assessed "with diaper dermatitis and anxiety."

Mother, who is the children's primary caregiver, testified at trial regarding the events of October 30, 2007:

> I waited 'til my kids were asleep. Went to go take a shower. While I was in the shower, my eighteen month old had climbed into the crib and hit my son with a cordless phone. When I got out, I heard him crying. Went in there and checked on him. My eighteen month old was in there in the crib hitting him. I got him out. Put him on the couch. Checked on my son. S[aw] that he was hurt. I called my husband's phone. He was at work in Adamsville. Couldn't

get in touch with him. Called his work. His . . . boss lady . . . went back there and got him. On his way home, he got stopped for speeding . . . . So, it took longer. When my husband got home, I took my son straight to the hospital

When questioned regarding Jimmy, Jr.'s ability to climb into Nathaniel's crib carrying a telephone, Mother suggested that Jimmy, Jr. slid the telephone through the crib slats and then climbed into the crib. She stated, "I know [Jimmy, Jr.] climbs, and we've done had to get him out plenty of times out of the baby bed with his brother." She claimed that prior to October 30, 2007, she had never seen Jimmy, Jr. strike Nathaniel. Instead, those numerous times in which Jimmy, Jr. had allegedly climbed into Nathaniel's crib, Jimmy, Jr. had simply exchanged his own sippy cup for Nathaniel's bottle. Mother submitted several photographs depicting Jimmy Jr. climbing on various objects, including a toilet, a gate, and a cabinet, as well as photographs of Jimmy, Jr. carrying Nathaniel's bottle, a television remote control, and potatoes in both hands. Mother claimed that most of these photographs were taken prior to the incident, but she admitted that the date appearing on the photographs could have been altered. Mother acknowledged her own difficulty holding Nathaniel down to place ice or a damp cloth on him, but she surmised that Jimmy, Jr. was able to hold his brother down and strike him "[b]ecause [Nathaniel] was asleep at the time."

Mother also presented photographs of Dakota and Jimmy, Jr. Specifically, she submitted a photograph of Jimmy, Jr. taken in November 2007, which she claimed demonstrated the lack of linear scars or bruises on his back. She also submitted photographs, which she claimed were taken after the children's removal to foster care, which allegedly depicted bruises on Jimmy, Jr.'s head and arms, and on Dakota's back, arms and legs. These pictures, according to Mother, demonstrated that the children were injured by their foster family.

At trial, Mother denied calling Jimmy, Jr. a "demon child." She also denied ever whipping Dakota, Jimmy, Jr., or Nathaniel, but she did admit having whipped Cody and Seth with a belt, a switch, and a paint-stirrer-like paddle. She suggested that if Dakota had confided to a counselor that Mother had spanked her, it was "'cause y'all put it in her head." Furthermore, she testified that any allegations of abuse by the children would be the result of "brainwash[ing]" by DCS who is "out to get [her,]" and that everyone is lying against her to "keep DHS from getting in trouble" and because "they're being paid."[4]

Father corroborated much of Mother's testimony about the incident. He stated that on the night Nathaniel was injured, Mother had called him at work at approximately 11:15

---

[4]Similarly, Mother testified that Father's ex-wife, who is Mother's "foster sister," had convinced DCS to take Cody and Seth "'cause she was jealous 'cause I was with [Father]."

P.M. telling him he needed to return home. Father testified that Jimmy, Jr. was weaned from his bottle prior to Nathaniel's birth, but that when Nathaniel was born, Jimmy, Jr. wanted Nathaniel's bottle "all the time" and that he would take it from him "[a]ll the time[.]" Father claimed that prior to October 30, 2007, he had seen Jimmy, Jr. climb up in Nathaniel's baby bed "[q]uite often[,]" as Nathaniel was put to bed with a bottle, and that "He'd put his sippy cup in there and get his bottle." In fact, Father stated that he had been forced to take Nathaniel's bottle from Jimmy, Jr. "[s]everal times a day." Father could not explain why, on October 30, Jimmy, Jr. beat Nathaniel with a telephone in order to get his bottle rather than simply swapping his sippy cup for it, which allegedly was his custom.

Father described Jimmy, Jr. as a "climber[,]" stating, "He'd climb up on the table. He'd climb up steps. Up railings." He also asserted that Jimmy, Jr. is "strong for his age" and he expressed his belief that Jimmy, Jr. possessed the necessary strength to "crack Nathaniel's skull." Unlike Mother, Father testified that prior to the October 30 incident, he had frequently seen Jimmy, Jr. strike Nathaniel with objects, as "[h]e was jealous of his brother." When Jimmy, Jr. did so, Father would "just tell him to quit." Father denied referring to Jimmy, Jr. as a "little demon[.]"

At trial, Father attempted to explain the injuries, or alleged lack thereof, to all of the children. He stated that he had never whipped Dakota, Jimmy, Jr. or Nathaniel. He contended that Dakota's scar was caused by "sheet metal in the back of [his] truck[,]" and that her statement that he had whipped her was Dakota "just saying what she was told to say[.]" Father denied the existence of linear whip marks on Jimmy, Jr.'s back and he accused Jimmy, Jr.'s foster family–with whom Mother "didn't get along"–of causing the healing fractures in his arms, alleging that he had "seen [the foster father] throw [Jimmy, Jr.] . . . in their van when they [were] leaving." He further stated that Jimmy, Jr. had never complained of any pain in his wrist or ankle. Father denied that Nathaniel sustained any fractures–apparently even at the hands of Jimmy, Jr.–while in the care of Mother and Father.

Finally, Father testified that he had no reason to believe that Mother had injured Nathaniel, claiming that he had never seen her exhibit abusive behavior toward him. Essentially, he asserted that DCS had taken his children–Cody, Seth, Dakota, Jimmy, Jr. and Nathaniel–away for no reason.

Father's mother ("Grandmother"), who lives next door to Mother and Father, also testified at the circuit court proceedings. She stated that she had seen Jimmy, Jr. climb into Nathaniel's crib "several times" and that Jimmy, Jr. is "a stout, strong little boy, and he . . . just loves mischief." Grandmother claimed that she had seen Jimmy, Jr. play with a plastic hammer and nail set, and that he was able "hit what he was aiming at with the hammer[.]" As evidence of Jimmy, Jr.'s strength, Grandmother cited Jimmy, Jr. having "head butted" her

and broken her glasses. In sum, Grandmother testified that the children's removal is "all a misunderstanding" because she knows that Mother and Father "didn't mistreat their children."

Finally, additional DCS personnel testified. Beverly Frisch, DCS Special Investigations Unit Team Leader, stated the she had extensively investigated allegations of physical and psychological abuse against the children's foster parents and found the allegations to be "unfounded." She explained that the bruises found on the children while in foster care were not located on "suspicious areas" of the body which would indicate possible abuse. Shannon Turner, DCS Family Service Worker, likewise testified that Mother and Father had made "a lot of allegations . . .towards the foster home[,]" and that "everything was investigated and it all came back unfounded." Misty Byrd, DCS Family Service Worker, stated that she has not recommended that the children be returned to Mother and Father because she believes they are unsafe in their home. She explained that Mother "gets very upset easily. She will scream, yell, you know, throw a fit at you."

April Smith, DCS Special Investigations Unit Investigator, similarly testified that following her investigations, she had concluded that the allegations against the children's foster parents were "unfounded." Ms. Smith also described Mother's supervised visit with the children in January 2008. She stated that Mother was allowed to take Dakota to the restroom alone, and a conversation was heard taking place in the restroom. When Mother and Dakota exited the restroom, Mother told Dakota to "[t]ell [the supervisor] what you just told me." Mother then recorded Dakota making sexual abuse allegations against a foster parent. Ms. Smith stated that Dakota had made no prior sexual abuse allegations and that an investigation found the allegation to be "unfounded."

Following the conclusion of the trial, the trial court entered an order on October 29, 2010, finding Dakota, Jimmy, Jr. and Nathaniel dependent and neglected, and finding that Nathaniel was severely abused by Mother and Father "either directly or by failing to protect the child." Mother and Father timely appealed to this Court.

## II. ISSUES PRESENTED

Mother and Father present the following issues for review, as summarized:

1. Whether there existed clear and convincing evidence of dependency and neglect; and

2. Whether there existed clear and convincing evidence of severe child abuse.

For the following reasons, we affirm the trial court's finding of dependency and neglect and its finding of severe abuse by Mother. However, we reverse the trial court's finding of severe abuse by Father.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d)** (2011); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. **Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC**, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." **Id.** However, "[w]hen the issues involve expert medical testimony that is contained in the record by deposition, determination of the weight and credibility of the evidence necessarily must be draw from the contents of the depositions, and the reviewing court may draw its own conclusions with regard to those issues." **Foreman v. Automatic Sys., Inc.**, 272 S.W.3d 560, 571 (Tenn. 2008) (citing *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

"A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." **In re Samaria S.**, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006)). This right, however, is not absolute. **Id.** (citing *DCS v. C.H.K.*, 154 S.W.3d 586, 589

(Tenn. Ct. App. 2004)).  "It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.* at 200-01 (citing *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004)).

One situation in which the rights of a biological parent may be limited is where a child has been deemed dependent and neglected.  *Id.* at 201.  A "dependent and neglected child," as relevant to this case, is a child:

> Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others; [or]
>
> . . . .
>
> Who is suffering from abuse or neglect[.]

**Tenn. Code Ann. § 37-1-102(b)(12)(F), (G)**.  "'Parents have a duty to provide, and children have a corresponding right to be provided with a safe environment, free from abuse and neglect.'" *Id.* (quoting *In re R.C.P.*, M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004)).  "The primary purpose of dependency and neglect proceedings 'is to provide for the care and protection of children whose parents are unable or unwilling to care for them.'" *Id.* (quoting *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 n.11 (Tenn. Ct. App. Mar. 8, 2005)).[5]

When the ground for a dependency and neglect petition is "abuse and neglect[,]" Tenn. Code Ann. § 37-1-102(b)(12)(G), the court shall determine whether the parents have committed severe child abuse.[6]  **Tenn. Code Ann. § 37-1-129(a)(2)**.  As relevant to this case, "severe child abuse" means:

> (A)(I) The knowing exposure of a child to or the knowing failure to protect a

---

[5]"'Children who are found to be dependent and neglected are frequently removed from their parents'[] custody and placed in the custody of [DCS].  If the parents' conduct that precipitated the dependent and neglect proceeding is sufficiently serious, a finding of dependency and neglect may be the foundation for a proceeding to terminate the parents' parental rights.'" *In re Samaria S.*, 347 S.W.3d at 201 (quoting *In re Gaven R.*, No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *7 (Tenn. Ct. App. July 23, 2007)).  In this case, a "Petition for Termination of Parental Rights" was filed in the McNairy County Juvenile Court against Mother and Father regarding Dakota, Jimmy, Jr. and Nathaniel, on September 10, 2009. **(V11, 90)**.  However, according to DCS, "[t]he Juvenile Court granted the Department's petition, but upon information and belief, a written order is presently pending execution."

[6]The court may make a severe child abuse determination regardless of the grounds alleged in the dependency and neglect proceeding.  **Tenn. Code Ann. § 37-1-129(a)(2)**.

child from abuse or neglect that is likely to cause serious bodily injury[7] or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

. . . .

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

(C) The commission of any act towards the child prohibited by § . . . 39-15-402 [aggravated child abuse and neglect] . . . or the knowing failure to protect the child from the commission of any such act towards the child[.]

**Tenn. Code Ann. § 37-1-102(b)(23)**. Both dependency and neglect and severe abuse must be found by clear and convincing evidence. *See* **Tenn. Code Ann. 37-1-129(c); *Dep't of Children's Servs. v. David H.***, 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006) (citing *Dep't of Children's Servs. v. M.S. & J.S.*, No. M2003-01780-COA-R3-CV, 2005 WL 549141 (Tenn. Ct. App. Mar. 8, 2005) *perm. app. denied* (Tenn. Aug. 29, 2005)).

As stated above, the circuit court found that all three children were dependent and neglected and that Nathaniel was the victim of severe child abuse "at the hands of [Mother] and [Father], either directly or by failing to protect the child."

1. Severe Abuse

a. Mother

On appeal, Mother and Father primarily argue that the trial court gave too much weight to the expert deposition testimony of Dr. Lakin and that it ignored Mother's "reasonable explanation" for Nathaniel's injuries, despite the lack of "direct proof to the contrary." In their brief to this Court, Mother and Father place great emphasis on a "Progress

---

[7]"'Serious bodily injury to the child'" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." **Tenn. Code Ann. § 39-15-402(d)**.

Note" written by an ER physician on November 1, 2007, which states "Family reports sibling was hitting patient in the head with a telephone. . . . Exam appears to be consistent with story reported to me." They also point to a hospital assessment form which confirms that Mother's hair was wet when she arrived with Nathaniel at the ER.

Mother and Father argue that Dr. Lakin is "just simply wrong about her conclusions" and they suggest that the trial court erred in accepting Dr. Lakin's testimony regarding Jimmy, Jr.'s inability to inflict Nathaniel's injuries because she only examined Jimmy, Jr. for twenty minutes, while Mother, Father and Grandmother all testified concerning Jimmy, Jr.'s stoutness, climbing abilities, and history of bottle-snatching. Additionally, they cite Dr. Lakin's deposition testimony in which she agreed that Nathaniel's skull fracture "turned out not to be a serious type of skull fracture[.]" Finally, Mother and Father note that Mother "had a habit and custom of taking all of the children to the doctor on a very regular basis" and that this conduct "is not consistent with someone who would be trying to hide child abuse [.]"

As stated above, Dr. Lakin characterized Nathaniel's skull fracture and soft tissue injuries sustained on October 30, 2007 as "significant injur[ies]" and she expressly acknowledged that the force necessary to inflict Nathaniel's skull fracture could potentially have caused great bodily harm. Dr. Lakin found Nathaniel's injuries inconsistent with Jimmy, Jr. having struck him with a telephone. Specifically, she opined that Jimmy, Jr., as a developmentally delayed eighteen-month-old, lacked both the strength to fracture his skull and the coordination to inflict "repeated blows." When questioned as to why a physician would state that Nathaniel's injuries were consistent with the history given, Dr. Lakin again stated her opinion that the injuries and history were inconsistent and she explained that "studies do support that physicians are very reticent in referring suspected cases of child maltreatment."

Moreover, Officer Strickland examined the telephone allegedly used in the assault, and he observed no sharp edges which could have caused the extensive scratches on Nathaniel, and he was unable to produce such scratches on himself. He testified regarding the short distance between Nathaniel's crib and the shower, and he opined that someone in the shower would be able to hear a child screaming. DCS personnel described Mother's and Father's attempts to blame the children's foster parents for their injuries.

The trial court specifically credited the testimony of Officer Strickland, Dr. Lakin, and DCS personnel Maria Mullins, Beverly Frisch, April Smith, and Misty Ballard. After thoroughly reviewing the testimony and evidence presented in this case, we find no basis for

overturning the trial court's credibility determinations with regard to the live witnesses. Moreover, conducting our own assessment of Dr. Lakin's testimony by deposition, we find it appropriate to credit, and therefore rely upon, her expert testimony. *See Foreman*, 272 S.W.3d at 571 (citation omitted).

The overwhelming evidence in this case indicates that Nathaniel's injuries could not have occurred in the manner explained by Mother and Father. We simply find it implausible that eighteen-month-old Jimmy, Jr. could have climbed into his brother's crib while carrying a telephone or that he possessed the forethought to slide his weapon into the crib prior to entry. Even if we assume, *arguendo*, that he could do so, the testimony indicates that he nonetheless lacked the ability to inflict repeated blows to Nathaniel's head in order to cause both the significant scratching to his face and the skull fracture, and that, at a minimum, Mother should have heard Nathaniel's screams for help.

We are not persuaded by Mother's version of the events of October 30, 2007, and we find most plausible that Nathaniel's injuries were inflicted by the only adult present that night–Mother. However, even if Nathaniel's injuries were somehow inflicted by a minor child, Mother certainly would have heard the commotion and should have intervened sooner in order to prevent serious injury. In sum, we find clear and convincing evidence exists to support a finding of severe abuse to Nathaniel by Mother.

### b. Father

Again, the trial court found that Father, like Mother, had severely abused Nathaniel. Despite Father's testimony that he was at work when Nathaniel was injured, direct evidence that Father actively engaged in or witnessed abuse of his children is not necessary to find that he is guilty of severe child abuse and that the children are dependent and neglected. *In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009). "[A] parent who has not directly abused her own child may still be found to have committed severe child abuse if she 'knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse.'" *Id.* (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004)).

"Knowing" and "knowingly" are not defined in Tenn. Code Ann. § 37-1-102, or in any other statute pertaining to dependency and neglect proceedings to terminate parental rights or in other civil proceedings involving juveniles. "The words 'knowing' and 'knowingly' do not have fixed or

-14-

uniform meanings, and their meanings vary depending on the context in which they are used or the character of the conduct at issue."

A parent who is present when a child is abused but who fails to intervene to protect the child has knowingly exposed the child to, or has failed to protect the child from, abuse. The "knowing" requirement in Tenn. Code Ann. § 37-1-102 (b)(21), however

> is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur.

Accordingly, a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*Id.* (internal citations and footnotes omitted).

In this case, the trial court's finding of severe abuse was limited to Nathaniel's injuries sustained on October 30, 2007. However, the existence of prior abuse to any of the children could have imputed Father with liability for Nathaniel's severe injuries of October 30, 2007. Dr. Lakin's skeletal survey revealed the presence of healing fractures in Jimmy, Jr., but Dr. Lakin was unable to pinpoint when the injuries occurred, even suggesting that the injuries may have occurred when the children were in foster care. Conflicting evidence was presented regarding the existence of, cause of, and seriousness of, the children's other "marks." Based upon Father's apparent absence from the home when Nathaniel was injured and the lack of proof that the children were abused prior to October 30, 2007, we reverse the finding of severe abuse to Nathaniel by Father.

### 2. Dependency and Neglect

On appeal, Mother and Father argue that they did not abuse their children, and that if abuse did occur, it was at the hands of the children's foster parents. As stated above, Jimmy, Jr.'s healing fractures could not be definitively linked to Mother and Father. However, our finding that Nathaniel was severely abused by Mother is sufficient to render the children dependent and neglected even if no other abuse occurred. By perpetrating severe abuse against Nathaniel or willingly placing her children in a home where she should have

-15-

recognized that abuse was occurring on that night, Mother provided "improper guardianship or control so as to injure *or endanger* the morals or health" of Dakota, Jimmy, Jr., and Nathaniel, so as to render them dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(12)(F). (emphasis added). The severe abuse against Nathaniel provides clear and convincing evidence to support this finding, and Mother's and Father's assertions to the contrary are without merit.

## IV. Conclusion

For the aforementioned reasons, we affirm the dependency and neglect finding and the severe abuse finding with regard to Mother. However, we reverse the severe abuse finding with regard to Father. Costs of this appeal are taxed to Appellants, Roseanna R. and Jimmy Dale R., and their surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.

-16-